IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF GEORGIA
SAVANNAH DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | CASE NO: 4:20-CR-123 |
| | ) | |
| BRANNON JEFFRIES | ) | |

**UNITED STATES' RESPONSE IN OPPOSITION TO DEFENDANT MOTION TO SUPPRESS EVIDENCE AND REQUEST FOR A *FRANKS* HEARING**

Defendant Jeffries Motion to Suppress Evidence and Request for a *Franks* hearing for a *Franks* Hearing (Doc 36) is without merit and should be denied without an evidentiary hearing. Defendant challenge the veracity of the search warrant affidavit, claiming that Defendant never directly admitted any specific conduct in certain recordings summarized as part of the affidavits submitted. In fact, these recordings demonstrate the truthfulness of the affidavits assertion that defendant "acknowledged" his past behavior. Furthermore, there is no offer of proof that agents intentionally omitted anything from the affidavit, let alone anything material. Defendants' factual and legal challenges are unfounded by the facts, unsupported by the law, and immaterial to the probable cause analysis. Defendants' Motion is properly denied without an evidentiary hearing.

**I.     Background**

On October 28, 2020, the Honorable Christopher L. Ray, United States Magistrate Judge for the Southern District of Georgia issued an arrest warrant for Defendant pursuant to a complaint filed alleging Defendant had committed acts of Cyberstalking against Victim 1 in violation of 18 U.S.C. Section 2261A(2). On the

same date, the Honorable Jodi F. Jaynes, United States Magistrate Judge for the Northern District of Oklahoma, found probable cause existed to issue a search warrant for Defendant's residence.  The next day, October 29, 2020, Judge Jaynes found probable cause existed supporting the search of defendant's vehicle.  Finally, on March 23, 2021, Judge Ray found probable cause existed to search various electronic devices associated to Defendant.

Each of the search warrants was supported by an affidavit of probable cause. The complaint was supported by a sworn affidavit from FBI SA Solomon. Exh 3.[1] FBI SA McCarthy swore an affidavit of probable cause in support of the search Defendant's residence and vehicle. Exh. 1 and 2.  And, SA Solomon also swore an affidavit in support of the electronic devices search. Exh. 5.

Each of the probable cause sections in these affidavits covers multiple paragraphs and provides specific, detailed information regarding acts committed by Defendant.  Exh. 1, P8-21; 2, P8-26; 3, P4-16; and 5, P7-24. Each affidavit of probable cause covered some of the same material first outlined in the Complaint affidavit completed by FBI SA Solomon on October 28, 2020.  These facts are contained in paragraphs 4-16 of the Complaint affidavit, paragraphs 8-20 of the house search warrant and vehicle affidavits, and paragraphs 7-17 of the electronic device search warrants.  In support of probable cause, these affidavits show the following:

---

[1] As Defendant has already submitted many of these documents to the court, the government will make citations to the complaint using those documents Exh number and paragraph as designated in Defendant's motion (i.e., Exh 1, P8).

### a. Facts contained in all affidavits

Prior to seeking the search warrants, FBI SA Solomon had been investigating ongoing online harassment committed by Defendant against Victim 1 which Victim 1 had reported to FBI in Savannah, Georgia on October 13, 2020. Exh 1, 2, 3, 5.[2] On that date and in follow up interviews with SA Solomon prior to the search warrant affidavits, Victim 1 provided details concerning her relationship with Defendant including problems Victim 1 had with defendant after she broke off their relationship. Exh. 1, P9-13. This description included a warning to Victim 1 by a friend of the Defendant that he intended to obtain a gun and travel to Kansas where the victim lived. Id. at P9. Victim 1 also described and provided recordings of conversations she had with Defendant in March and April 2019. Exh. 1, P10. Following these initial interviews, Victim 1 continued to provided information to FBI regarding additional, ongoing harassment that occurred via the US mail and imposter social media accounts. Exh. 1, P15. In fact, the day before the affidavits were presented to the courts, October 27, 2020, FBI SA Solomon witnessed Defendant contact Victim 1 via an imposter Facebook account in her name. Exh 1, P18.

More specifically, each affidavit began by describing Defendant and noting he resided in or around Tulsa, Oklahoma. Exh. 1 and 2, P8; Exh. 3, P4; Exh. 5, P7. Based on the interviews with Victim 1 on October 13, 2020 and later, the affidavits

---

[2] Because this section outlines those facts which are the same in each affidavit, the government will only include citations to Defense Exh. 1. Where there are additional facts contained in one affidavit or the other, the government will make citations to the specific affidavit as appropriate.

then outline Victim 1's relationship with Defendant as well as the trouble she was having with Defendant leading up to her report with FBI. Exh 1, P9-14. There, the affidavits describe that Victim 1 and Defendant began a relationship in November 2018 while she was living in Kansas and that Victim 1 ended the relationship in January 2019. Exh 1, P9. Thereafter, in March of 2019, a friend of Defendant's warned Victim 1 that Defendant planned get a gun and travel to Kansas to see Victim 1. Id. At around the same time, Victim 1 learned that Defendant was using imposter Facebook and Twitter accounts in Victim 1's likeness to post intimate pictures of her – some of which he tried to share with her sister online. Victim 1 also reported that Defendant had tried several times to call her from these imposter accounts. Id.

The affidavits also outlined that Victim 1 attempted to de-escalate the situation by reopening communication with Defendant in March and April 2019. Exh. 1, P10. During this time, Victim 1 recorded a series of phone conversations which she provided to FBI during which Defendant acknowledged creating pages and prior threats of gun violence, expressing a need to hurt her because she had hurt him and that only revenge would bring him peace. Id. Following these phone calls, Victim 1 cut off communication with Defendant in May 2019 and changed her number. Id. at P11. However, Victim 1 reported that Defendant continued to make imposter accounts on both Facebook and Twitter, and he also continued to attempt to call her using Google Voice and Facebook. Id. In April 2020, Victim 1 moved to Savannah to be farther away from Defendant. Id.

This, however, did not stop Defendant's harassment. In August 2020, Victim 1 received a letter in the mail at her apartment in Savannah. Exh. 1, P12. The letter was addressed to Victim 1 with no return address which, although it had been postmarked in Tulsa, Oklahoma where Defendant resided at that time. Exh 1, P12, 8. The letter consisted of a single word, "Inevitable," typed on an otherwise blank page. Id. During this same time, new imposter social medial accounts contacted Victim 1, and she reported these developments to Savannah Police Department. Id.

On October 12, 2020, the day before she reported the harassment to FBI, Victim 1 googled her name and discovered a new imposter website utilizing her full name. Exh. 1, P13. The website identified Victim 1 as very interested in gangbangs, criticized and sexualized her mother, and attacked Victim 1's loyalty. Id. The website also included several intimate photos of Victim 1 – including one depicting a black male standing behind Victim 1 holding her breasts. Although his face is obscured in the photo, Victim 1 identified the male as Defendant to the FBI. Id.

According to the affidavits, all of this was reported to SA Solomon on or about October 13, 2020. Exh. 1, P14.

Thereafter on October 19, 2020, Victim 1 reported that she received an email from someone she did not know claiming to have seen the website and asking if Victim 1 was aware of its content. Exh. 1, P15. Less than an hour and half later, Victim 1 missed a call from an imposter Facebook account in Victim 1's name.

On October 27, 2020, Victim 1 used the Facebook messenger application to call the imposter account utilizing her name in the presence of SA Solomon. Exh. 1,

P18.  This was the same imposter account which had attempted to call Victim 1 on October 19, 2020.  Id.  After the call did not connect, Victim 1 used Facebook messenger to send the user a text message, "Brannon we need to talk," to which Defendant responded, "You can call me."  Victim 1 then called the imposter account and addressed the user as "Brannon."  During the call, Victim 1 confronted Defendant about the imposter social media and website.  Id.  When Victim 1 asked him how long it would go on, Defendant was initially silent.  When asked again, he said, "what you think?"  Defendant also said he was angry Victim 1 had changed her phone number after they last talked.  Id.

The affidavits also describe Victim 1's reaction to conversations with Defendant.  They note that SA Solomon observed Victim 1 shaking while speaking to Defendant and that Victim 1 cried after the conversation on October 27, 2020. Exh. 1, P19. In addition, each affidavit relates that Victim 1 is in distress over the harassment continuing for over two years, that SA Solomon had observed Victim 1 in tears during their personal interactions, and that Victim 1 was in fear of retaliation from Defendant.  Id.

Each affidavit also notes that FBI had sent preservation letters and/or issued grand jury subpoenas for website, social media, and email information relevant to the case on October 15, 16, and 19, 2020. Exh. 1, P16.  The affidavits also note that the letter sent in August was submitted for fingerprint analysis. Id.  At the time of their writing, the affidavits in support of the complaint and in support of the search warrants for Defendant's home and vehicle indicate that these processes were

pending as of October 27, 2020.  Exh. 1 and 2, P16-17; 3, P12-13.

Finally, each affidavit related that Defendant had an active arrest warrant from Wisconsin for "online harassment."  Exh 1, P20. The affidavits also established that Defendant had been convicted in 2010 of felony sex crimes following an incident in which Defendant was identified as raping two women at gunpoint.  Exh. 1, P20.  In addition, the affidavits related that Defendant is required to register as a sex offender.  Id.

### b. Additional facts contained in search warrant for Defendant's residence.

In addition to the facts outlined above, the search warrant for Defendant's residence outlined that Defendant had been convicted of federal charges for failure to register in 2011. Exh. 1, P20.

The affidavit also provided information that Defendant resided at the residence which was the subject of the warrant.  Databases indicated Defendant had lived in the residence since April 2017, that he had listed the address on appearance bond paperwork for his previous case, and that he was observed leaving the building containing the residence during surveillance on October 20, 2020. Exh. 1, P21.

### c. Additional facts contained in search warrant for Defendant's vehicle.

In addition to the facts outlined in sections a and b above, the search warrant for Defendant's vehicle outlined that Defendant had been observed driving the

vehicle when leaving the residence on October 20, 2020 during surveillance by law enforcement. Exh. 2, P21.

On the morning of October 29, 2020, when FBI executed the original search warrant issued on October 28, 2020, however, Defendant was not present at the apartment. Exh. 2, P22. Later, Defendant returned to the apartment driving the vehicle which he parked next to a fire hydrant. Exh. 2, P23. Defendant was arrested as he exited the vehicle, and a search incident to arrest located his cell phone. Id. Agents also observed a backpack in the vehicle. Id. The affidavit then noted that the earlier search warrant allowed the search of any vehicle parked in a designated parking spot for the apartment, and that although the vehicle was not parked in the designated spot, Defendant was arrested immediately after he drove up in the vehicle. Exh. 2, P24. The affidavit also includes reasons the affiant believes phones or other electronic devices might be found in the vehicle. Exh. 2, P25-26.

### d. Additional facts in search warrant for electronic devices

In addition to the facts outlined above, the search warrant for electronic devices included several additional facts.

Regarding the email account which contacted Victim 1 on October 19, 2020, the affidavit noted that Google provided information that the account had been created on September 20, 2020 and was associated to 901-690-3127. Exh. 5, P15. In addition, the affidavit relates that Facebook provided information that the account in Victim 1's name was associated to the same phone number. Id. FBI had also

confirmed that this number belonged to Defendant. Id.

This affidavit also describes the complaint arrest, as well as the search warrants for the apartment and vehicle on October 29, 2020, during which the electronic devices were seized. Exh. 5, P18. During the search, Victim 1's address was found written on a piece of paper in the apartment and Defendant admitted during a subsequent custodial interview that he had found it "a few months ago." Exh. 5, P19. The affidavit then confirmed that Defendant's fingerprints had been identified on the letter sent to Victim 1 in August 2020. Id.

This affidavit also includes an interview of Witness 1, the friend who warned Victim 1 of Defendant's intent to purchase a firearm. Witness 1 confirmed the details provided by Victim 1 and also indicated that Defendant had admitted to creating a Twitter account in Victim 1's likeness. Exh. 5, P 20.

Finally, the affidavit includes additional information concerning the various ways Victim 1 communicated with Defendant and a description of why, based on SA Solomon's training and experience, the devices might contain evidence of Defendant's criminal behavior and mindset. Exh 5, P21-24.

## II. *Franks* Issue

An affidavit presented in support of a search warrant carries "a presumption of validity," *Franks v. Delaware*, 438 U.S. 154, 171 (1978), and any defendant who seeks to offer evidence impeaching the affidavit's factual assertions must meet an "onerous" burden. *United States v. Daoud*, 755 F.3d 479, 488 (7th Cir. 2014); *United*

*States v. Clenney*, 631 F.3d 658, 663 (4th Cir. 2011) (*Franks* imposes a "rigorous" standard). Under *Franks*, the defendant is required to make "a substantial preliminary showing that a false statement knowingly or intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit" and demonstrate that the allegedly false statement is necessary to the finding of probable cause. *Franks*, 438 U.S. at 155-56. Mere "conclusory" allegations of deliberate falsehood or recklessness will not suffice. Id. at 171. Rather, the defendant must make "an offer of proof," supported by affidavits or other reliable witness statements, establishing the deliberate falsity or recklessness of the affiant's own statements (not those of some witness or informant who misled the affiant), or satisfactorily explain the absence of such evidence. Id.

A false statement in an affidavit that springs from mere "negligence or innocent mistake" does not entitle a defendant to any relief -- the falsehood must be included either deliberately or recklessly by the affiant. Id. *Franks*, however, did not elaborate on what form of recklessness it had in mind -- the subjective recklessness used in the criminal law, which requires that a person disregard a risk of harm of which he is aware, or the objective recklessness used in the civil law, which permits liability to be founded upon the disregard of a risk that is "so obvious that it should

be known." *Farmer v. Brennan*, 511 U.S. 825, 836-37 (1994) (holding that the "deliberate indifference" state-of-mind requirement for establishing a prison official's civil liability for an Eighth Amendment violation should be defined in terms of the subjective recklessness standard of the criminal law, not the objective civil-law recklessness standard); id. at 839 (noting that its precedents had adopted the same subjective standard in assessing "reckless disregard" for the truth in a defamation action by a public figure). While the Eleventh Circuit has yet to "stake[ ] out a bright line" for recklessness in the *Franks* context, other appellate courts have interpreted the *Franks* "reckless disregard" language as requiring "a high degree of awareness of [the statement's] probable falsity." *Wilson v. Russo*, 212 F.3d 781, 788 (3d Cir. 2000) (also "borrow[ing] from the free speech arena").

    a. The Alleged Falsehoods

Despite the very detailed and specific statements of probable cause contained in the affidavits at issue in this case, Defendant points to only two assertions which he contends are false, both of which relate to the series of recorded conversations described by Victim 1 and provided to FBI in Savannah. Doc. 36, p. 2, 4. These assertions are documented in paragraph 6 of the complaint affidavit, in paragraph 10 of the residence and vehicle search warrants, and paragraph 9 of the electronic devices search warrant. In sum, they amount to two areas of complaint. One, that the affidavits falsely assert that Defendant acknowledged creation of social media accounts. And two, that the affidavits falsely assert that Defendant acknowledged threats of gun violence. Neither of Defendants claims are sufficiently "substantial"

to warrant an evidentiary hearing. Franks, 438 U.S. at 151.

### i.  Social Media

In support of his claim, Defendant argues that he "never admitted to creating imposter social media accounts with the purpose of humiliating the alleged victim." Doc. 36, p. 5.  Rather, Defendant insists he spoke only in general terms never admitting any specific conduct and claims he denied such conduct by stating no one else had the picture and they were nowhere posted.

However, Defendant's claim that the pictures were not posted anywhere in March 2020 is not a denial that Defendant had posted pictures or created fake social media accounts in the past as asserted in the affidavit. In fact, that very denial came almost 25 minutes into a conversation during which Victim 1 confronted him about this past.  During the conversation, Victim 1 explicitly confronted Defendant about the prior harassment of her through social media. Exh B, 00:00-00:53.  Victim 1 repeatedly challenged Defendant's refusal to say he would not post pictures of her because that made her feel like he would do it again. Defendant did not deny this conduct.  Rather, he simply stated he would not predict the future. Id. The conversation continued with Victim 1 confronting Defendant about legal action she might take and how bad it hurts her.  Once again, Defendant did not deny the previous conduct but said going to court would be more embarrassing for Victim 1. Id., 01:00- 01:53.

Later in the same conversation, Victim 1 said she did not believe Defendant felt bad for posting pictures to Twitter, that he felt justified for doing it because he

was hurt, and once again challenged Defendant to tell her he would not do it again. Id. 04:30-05:27. Defendant's response clearly acknowledged his use of social media and his reasons for doing it. Defendant stated, "I can say it and mean it, but then I'm not going to say, like, if I get mad or whatever about why you broke up with me or whatever, I'm not going to say I won't be mad or whatever, be angry and want to lash out or whatever…" Id. 05:27-06:00. This conversation continues in a similar way during which similar admissions are made by Defendant. Id. 06:00-21:00.

These statements can not be analyzed out of context. Each affidavit begins with Victim 1's description of Defendant's actions leading up to these phone calls, during which she was aware of his action on social media. This context only makes it more clear that Defendant is referring to his prior use of social media to lash out at the victim and to hurt her the same way she had hurt him. As such, it can not be said that the assertions made in the affidavit were made with "a high degree of awareness of [the statement's] probable falsity." Likewise, Defendant cannot establish any deliberate falsity or recklessness showing this claim is sufficiently substantial to justify a *Franks* hearing.

### ii. Threats of Violence

Defendant also argues he never acknowledged a threat of gun violence, but explicitly denied it when he told Victim 1 it was not his intention to kill her. This claim fails for similar reasons. Defendant's denial of an intention to kill Victim 1 does not amount to a failure to acknowledge other underlying threats of gun violence. The recorded conversations provided to the court by Defendant bear this

out. During these conversations, there are several conversations which acknowledge his possession of a gun and obsession with relationships which ended in deaths or suicides.

Once again, these conversations must be taken in the context of Victim 1's report to FBI Savannah detailed in the affidavits. Each affidavit explains that Victim 1 had been informed by a friend of Defendant's that he planned to get a gun and travel to Kansas to see her. In this context, several conversations function as acknowledgments of threats of violence. One such conversation begins with Victim 1 talking about getting the phone call (a reference to the call from the friend about the gun). Exh A. 02:51. Defendant goes on to acknowledge that they had talked about this before and discusses how many relationships end in deaths or suicides. Id. 02:51-04:58. Later in the same conversation, Defendant and Victim 1 spoke for almost 18 minutes about concerns over violence. Id. 34:20-52:00. During this time, Victim 1 told Defendant that if he had shown up with a gun, she was not going to fight it to which Defendant simply responded, "yeah." Id. 38:10-39:30. At no time does he deny these threats. Rather, Defendant gets mad about Victim 1's friends that wanted to protect her. Id. 41:00-41:14.

During the conversation above wherein Defendant refused to say he would not lash out at Victim 1 again, Victim 1 also confronted Defendant about violence. At one point, Victim 1 confronts Defendant saying she is still talking to him even though to her knowledge he threatened her life and posted pictures of her online. Exh. B, 18:00-19:45. Defendant never denies threatening her life and merely

laughs off her decision to break up with him. Id. 19:45-20:00. After Victim 1 tells Defendant there are more people that handle breakups without violence than there are people who use violence, Defendant makes perhaps his perhaps his most telling admission stating, "You know what, I guess those people that can't handle it the right way are shitty people, that I'm a shitty person then." Id. 26:30-27:00.

Defendant, however, relies on one conversation during which he stated he did not intend to kill Victim 1 as evidence of falsehood. Exh C, 38:25-38:55. In the very conversation submitted by Defendant in support of his allegations, however, underlying threats of violence were also pervasive. During that conversation, although Defendant claims he did not intend to kill her, he repeatedly admits to quitting his job, having a "fucked up" plan, and obsessively reading stories about a man killing his girlfriend. Id. 31:00-32:00. Defendant went on to say, "I didn't know what I was going to do [Victim 1]. I didn't know what was going on with me. The person who said literally they going to spend the rest of my life with them had just told me no bye." As Victim 1 explained to Defendant during this call, threats of violence are implied in all these actions.

When taken together, it cannot be said that the assertions made in the affidavit were made with "a high degree of awareness of [the statement's] probable falsity." Likewise, Defendant cannot establish any deliberate falsity or recklessness showing this claim is sufficiently substantial to justify a *Franks* hearing.

    b. Materiality

*Franks* requires, in addition to a convincing showing of deceit or recklessness on the part of the affiant, that the defendant demonstrate the materiality of any alleged falsehood. Only if the misstatement (or omitted information) is "necessary to the finding of probable cause" will the warrant be voided and the fruits of the search or seizure be suppressed. *Franks*, 438 U.S. at 156. If, when the affiant's allegedly false material is set to one side, there remains sufficient content in the warrant affidavit to support a finding of probable cause, the Court need not conduct a hearing to afford the defendant an opportunity to prove his allegations by a preponderance of the evidence. Id. at 156, 171-72.  As such, insignificant and immaterial misrepresentations or omissions will not invalidate a warrant. *United States v. Reid*, 69 F.3d 1109 (11th Cir. 1995); *United States v. Glinton*, 154 F.3d 1245 (11th Cir. 1998); *United States v. Jenkins*, 901 F.2d 1075 (11th Cir. 1990); *United States v. Arbolaez*, 450 F.3d 1283, 1294 (11th Cir. 2006); *United States v. Kapordelis*, 569 F.3d 1291, 1308-1310 (11th Cir. 2009).

It is quite one thing to say that the affidavit was deficient in failing to include some information and quite another to say that the information's omission was designed to mislead, or made in reckless disregard of whether it would mislead, the magistrate. Defendants have not made a "substantial" showing that the agent deliberately or recklessly concealed this information. Defendants' proof – Defendant's denial of some but not all the conduct describes – does not establish the type of falsehoods that will suffice under *Franks*.

At its core, the unchallenged evidence is strong.  Defendant does not

challenge any of the remaining evidence put forth in the affidavit. Defendant does not challenge that Victim 1 had reported his past threats and social media harassment to FBI. Defendant does not challenge the truthfulness behind the letter Victim 1 received – postmarked from Tulsa, Oklahoma where Defendant resides. There is no challenge to the additional websites or imposter Facebook accounts meant to humiliate Victim 1 in October 2020. Finally, there is no challenge to the fact that Victim 1 contacted Defendant on an imposter Facebook account utilizing Victim 1's name on October 27, 2020 and no challenge that this was interaction was witnessed by SA Solomon.

As such, even if the complained of paragraph were excised from the warrant all together, probable cause remains intact in this case. Similarly, probable cause would be unaffected by inclusion of Defendant's claims the photos were no longer online in March 2019 and statements that Defendant did not intended to kill the victim, especially given the admissions that are contained in the recordings. It must also be remembered that these recordings simply provided background and context to the relationship between Victim 1 and Defendant. The actions discussed in them concerned activity over a year prior to Victim 1 living in Savannah. The crime under investigation at that time, however, was primarily supported through evidence describing activity in the Southern District of Georgia while Victim 1 had been living in Savannah, Georgia after April 2020. This activity in August and October 2020, especially the call witnessed by SA Solomon, established ample probable cause for the crimes Defendant was committing at the time the warrants

were issued in this case. As such, the complained of statements are helpful, but not essential to probable cause. Therefore, there simply was no misstatement or omission of information so necessary to probable cause requiring the warrant be voided and the fruits of the search be suppressed.

### III. Defendant is not entitled to an evidentiary hearing.

Because the *Franks* "substantiality requirement is not lightly met," United States v. Arbolaez, 450 F.3d 1283, 1294 (11th Cir. 2006), Defendants contesting the truthfulness of a warrant affidavit receive a hearing only "infrequently." United States v. Daoud, 755 F.3d 479, 488 (7th Cir. 2014). Defendants' veracity challenge is in sufficient on its face. Defendants are not entitled to an evidentiary hearing because they did not make "a substantial preliminary showing that a false statement knowingly or intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit" and did not demonstrate that the allegedly false statement is necessary to the finding of probable cause. Franks, 438 U.S. at 155-56. As such, Defendants did not meet their onerous burden. Because neither the elimination of the alleged falsehoods, nor the inclusion of the information that Defendant claims was deliberately or recklessly omitted, would defeat probable cause, this Court can say with confidence that Defendant' veracity challenge is insufficient on its face, without any need for holding an evidentiary hearing.

### IV. Conclusion

For these reasons, Defendant's factual and legal challenges are unfounded by

the facts, unsupported by the law, and immaterial to the probable cause analysis. Defendant's Motion to Suppress Evidence and Request for a *Franks* Hearing should be denied without an evidentiary hearing.

Respectfully submitted,

>DAVID H. ESTES
>ACTING UNITED STATES ATTORNEY

>*/s/Frank M. Pennington, II*
>Frank M. Pennington, II
>Assistant United States Attorney
>Georgia Bar No. 141419

P.O. Box 8970
Savannah, Georgia 31412
(912) 652-4422